312-1046, Raymond Smith, appellate by Michael Rastak v. Martin Ryan at Myre's Farming Enterprises, appellate by Jerry Heaton. Good morning. Good morning, Your Honors. Michael Rastak, I'm here on behalf of the plaintiff appellant in this case, Mr. Ray Smith. Mr. Smith, of course, is the gentleman who lost his leg in the farming accident when he stepped across a hopper and slipped, and his foot went into a hole, and the guard over the auger in the hopper severed his leg. The circuit court granted summary judgment on the grounds that the danger was open and obvious, and that therefore the Myre Farming Enterprises did not owe the duty to Mr. Smith. We have four issues on appeal. The first one, I think, I hope we've made it clear in the brief, it has always seemed obvious to me that it's simply not obvious. At least it was not obvious to Mr. Smith at the time of the incident. I don't think anybody, as far as I know, disagrees with the fact that at the time of the incident, the auger was in operation, the beans were pouring down. Your Honors could see the photos in the appendix to the brief that correlate or confirm the testimony that when you're using the auger and the hopper, the beans simply cover everything, so that you may have a piece of machinery that when it was empty four days earlier, you would be able to see this 8 by 10 hole that had been cut into the guard. But once you begin to use the machine, the beans are pouring in and pouring up, and it covers everything, even the guard over the auger. And our position is quite simple. It was not obvious to him. The circuit court judge did not really explain specifically why he thought the danger remained obvious. I can only assume that because Mr. Smith saw the hole four days earlier, that the circuit court judge thought that that meant that four days later, he still would remember it was there and to him it should still have been obvious. I'm not able to find a case where any court has held that if you've seen something and then sometime later that defect is covered or hidden, that you're still bound by what you saw earlier. And even then, it should go to contributory negligence, which isn't an issue. The issue is whether or not the farming enterprise owed him a duty, and the duty was to furnish him with a safe place to work. If the court is not willing to accept that it was not open and obvious to Mr. Smith at the time of the accident, then the next question is, was the circuit court correct when it found the danger to be open and obvious when all it seemingly considered was the hole and the auger? The circuit court, in its discussion of the case, ignored the fact that it was a combination of dangers. Mr. Smith was stepping over the auger and testified he had done this before and that he did not even have to step onto the auger to get over it. He's a tall, rangy man. He's not here today. I'm advised he's actually working for the same employer because it's harvest time. But he's a tall, rangy man. He said, no, I could just get over it. His co-worker said he really sort of hopped over it. Everybody else stepped onto it. But the point is that there was a tarp underneath this auger. It had been raining that day. The tarp is there because Meyer Farming Enterprises and Mr. Meyer direct that they put the tarp under the hopper and it's there to pick up the beans that fall off the edge. And when you get done, I gather you pick up the tarp and pour the beans back in the auger so you don't lose any grain. The problem was that it was wet. And then he slipped when he went over the auger. So we have a combination of dangers here. You have a slippery working surface and a hole in the auger. The question for the court is, as a matter of law, is that all open and obvious to a gentleman who's working there? And even if the court doesn't get to that point, then the next question is, did he appreciate, did Mr. Smith appreciate the risk? Because one of the rules is that it has to not only be obvious, but you have to appreciate the risk. And my question is simply, how can you appreciate a risk that you do not intend to undergo? And the best analogy I could use was the snow thrower analogy that I used in my brief. Now maybe I'm far enough down into southern Illinois that I might have to explain about the snow thrower, but I'm from Wisconsin, so it was a good analogy when I thought about it. The old-fashioned snow throwers had an auger in it that shoveled snow in, and then a discharge suit, not all on like this thing that throws it out the side. In the old ones, they didn't put a guard in. People would reach into that discharge suit and hit the auger and lose fingers and hands. Ultimately, they put guards over them. But my question is, what if I'm out with my snow thrower and I slip and fall? I no longer intend my hand to go into the discharge suit. So I haven't appreciated the risk because I don't even want to encounter the risk. I don't want anything to do with it. It's an accident. And that's what happened here. He cannot be said to have appreciated a risk that he did not want to encounter. And if I have to move, and if the court needs to move in order to reverse the summary judgment, we have to move to the fourth point, whether or not, assuming it's open and obvious, there are two exceptions to the open and obvious rule, the deliberate encounter exception, and that was highlighted by the Lefevre case. That's really the case that's, I think, the grandfather of it. If the court recalls, in the Lefevre case, the employer had a bin outside, and scrap was thrown into it, but a lot of the scrap ended up around this dumpster. And an employee walked out and slipped on it and hurt himself. And the court said, that's a deliberate encounter, even though the materials laying outside the dumpster that made the ground dangerous were obvious to the person working there. The employer, the person who owned the dumpster, actually, still owed him a duty because the employer could foresee that the worker, either to put something in the bin or to get the bin on his truck and tow it away, would probably step on the pieces of scrap. And in this situation, Mr. Meyer had to know that Mr. Smith was going to either step over the hopper or, like most of the employees, step on the hopper. Because if the court recalls, even Mr. Meyer himself stood on the hopper upon occasion to open up the gate to the back of the truck to let the beans come out. So he had to foresee that somebody was going to step on or over this hopper and he could foresee that something would happen if there was a hole in the hopper. And Mr. Meyer, nobody disagrees with this, Mr. Meyer had a duty to inspect this equipment. The law requires that the employer, in this instance, and this is law that started before the workers' comp really came into force, there's a duty on the part of the employer to inspect. And where would the duty to inspect be firmer or more concrete than a situation like this where the farming enterprise was borrowing an old piece of equipment? I mean, you might not inspect something new that just came down the road from John Deere, but all you have to do is look at this picture in the back. It's a rusted old auger and hopper. That's the one you would inspect. But Mr. Meyer testified, I don't inspect the equipment. So you have a situation where you have a deliberate encounter. Mr. Meyer should foresee that Mr. Smith would encounter the danger because everybody else did the same thing. And if that's not the case, we still have the distraction exception. And the best case I have for the distraction exception is the football helmet case where the student walks across the playing field. There's a 64-square-foot hole. It's only about that deep. It's 64 square feet. When he walks back across it, the court said he was distracted by carrying the helmet. There's no emergency. This wasn't some football game. It was a practice. Somebody needed his helmet fixed. The court said he was allowed to forget what was there. The other case is the Schaefer case. In the Schaefer case, the worker on the construction site knew there was a hole in the floor, but he was moving something later and forgot about it. In this case, the facts are much better for us because this is a case, like all of the cases cited in the Balog versus City case, where you could not see the danger. So he's distracted by the fact that he's got to get this load done by the end of the day. It's getting dark. It's starting. It's raining. The bin is filling, and he's got to get up to the bin and run up the stairs. It's some distance away. The auger itself is 91 feet long. You can see from the drawing. He's got to run around the corner of it. He has to make sure there's room in the bin for the other half of the truckload because they'd only unloaded half of it. He can't stop the auger because now it's full of beans. And if he stops it and then runs up and looks and says, we have room and comes back down, when they start the auger up, it'll shear the pin because you've got such a load on the auger. That's the distraction, and that surely seems to me, I hope the court sees it the same way. That's a question for the jury. Was that reasonable? Was that foreseeable? Under any one of those four points, Meyer Farming owed a duty to Mr. Smith, and for that reason we think the court erred in granting summary judgment. I think I understand what happened at the hearing. The circuit court judge first handled the bailment case, which is not on appeal. In the bailment case, the circuit court granted summary judgment to the person who owned this auger and cut the hole in it because Mr. Timmons, who owned it, and Mr. Smith came to pick it up, they could see it at the same time. And under a bailment, the duty is owed at the time I give the person the product. I do not have to warn the person about the danger if the person could see it when I give them the product. And that was the case there. That's why we did not appeal that case. But then the judge moved forward and seemingly, apparently forgot that there was a four-day gap in between there, and that by the fourth day, it was no longer open, it was no longer obvious, and Mr. Smith was going to encounter it, and he was distracted. Let me ask you, is that ultimately a fact question as to whether he remembered or didn't remember the hole, or should have remembered it? I believe it's a question of fact. He said I did not remember it. It would be up to the jury to look this man in the eye and say, I don't think you're telling the truth. What would support that is the fact that, I guess twofold, everybody has always stepped on this auger as routinely, because it's safe. As long as you don't have a hole in it, it's safe. The guard itself will let you stand on it. You can stand on the edge, you can stand right on the auger, on the hopper, right above the auger. I would not do it. But they did it, and Mr. Meyer apparently did it himself. So the question then becomes, did he forget? Assuming if he didn't forget, that would imply that he knew it was there, and you would still run into the deliberate encounter exception, which is even if he knows it's there. That's a little broader answer to my question. I'm sorry. I'm sorry. I just get carried away. I don't know. It's fine. You can do it. But getting back to the core question I asked, do you think that that memory issue is a fact question? Yes, I do. If somebody says I did or I did not remember, there are cases where the people admitted, I knew it was there. Some were lost and some were not lost. The gentleman, Simmons case, the gentleman walks out of the store and kind of gets squeezed by some barricades. Now he saw those barricades when he went in. He just didn't think of them when he was going out. That case was sent to the jury. I don't know how that case could be different than this case. Both at some point saw it. That gentleman saw it going into the store. This gentleman saw it four days earlier. That gentleman, when he came out, could still see it if he looked. This gentleman, four days later, cannot see anything. And everybody agrees on that. Following up on Justice Litton's question, this is summary judgment. Yes, this is summary judgment, precisely. So following up on his question, if it is not contested that he didn't remember, in other words, the facts aren't contested and that it's true he did not remember, does that affect the cause of action? The way Your Honor phrased it, if it's uncontested, we should get a directed verdict on liability. It was pled that he didn't remember. Was it pled that he didn't remember? Honestly, I don't know what the allegations in the complaint were, but the testimony, the evidence furnished with the summary judgment was his testimony that he did not remember it. He didn't see it because he couldn't see it. Because, I think as he put it, he was busy. He was on it. It's probably more accurate to say he didn't think about it. This is something that would be argued to a jury. He didn't think about it because he was on his way to check the bin. I guess like the young man was carrying the football helmet. I mean, he'd seen it, and he could see it. Thank you. He could see it on the way back through. In the Simmons case, he could see the post outside. In the Schaefer case, he could see the hole that was in the floor. In the Clifford case, the carpenter had actually cut the hole in the floor and left it open and was knocked into it. They could all see it. But there's a distinguishing factor in this case, and that is that there's four augers that Meyer uses that look alike. Correct. So he not only had to remember that there was a hole there, but he had to remember that was the auger. Exactly. There's an inference there might be 10 augers because the testimony was that there were 10 work sites and an auger at each site. So if he didn't remember as a matter of fact, then where does the law fall? If he doesn't remember a matter of fact, there should be a directed verdict on that issue in his favor. If he didn't remember, then the law says that's distraction, that's momentary forgetfulness. I'm sorry. The phrase in the case is momentary forgetfulness. The owner owes a duty even if I forget. You've answered my question. Thank you. Mr. Rathsak, I have a question. I'm sorry. I just want to clarify. My understanding was that there were four Westfield augers, and then this was a fifth one. Is that correct? That was the testimony, yes. And also that they didn't all remain at the same site all the time. They were moved from place to place? That's correct. Yes, that's correct. So was there any way for him to know that the auger that he had seen when he picked it up from the Timmons farm was the same auger? Not at all. I apologize. That isn't buried on the bottom of these notecards, Judge. Precisely. This was actually the fifth one. They all look alike. And there was testimony that they moved them around and that he had moved around that day. He was not necessarily even aware that he was on the site where this auger had been put in the first place. I think, as he put it, he'd been in a thousand different places. It's harvest season. They work up from sunup to sundown. Unless anyone has further questions, thank you for your attention. Thank you. Thank you. Counsel, you may proceed. Good morning, Your Honors. Good morning. My name is Gary Eaton. I represent Meijer Farms and Martin Meijer's. I think because of some of your questions, I'm going to prepare an argument and do it a little different. Martin Meijer did have four Westfield walkers. Each of them were south of the river. They were doing some work on a bridge, which made it difficult for them to get over entirely. His cousin, who lived down the road, had an exact same Westfield auger. Each of Martin Meijer's augers had a protective screen on them, and they were complete and intact. Ray Smith went to the Timmons Farm to pick up the auger. In doing so, he helped him pull it out. He helped him grease it, and they greased it actually through the hole in the protective screen, an 8x10. He knew of the hole. There's no doubt. He said that he saw it on that date, and in his deposition, Mr. Smith said he's seen it on numerous occasions since then. Now, Martin Meijer provides each and every one of his employees a Nextel phone so that they have a problem, they can communicate with him at any time, any place. When they were at the farm picking up this auger, which is right down from the facility where they're going to use it, Mr. Smith did not call and tell him about this hole. Rather, he continued to take it to the facility, grain facility, set it up, and use it. At no time did he or his co-employee ever tell Martin Meijer. So what is not disputed in this case, and it's extremely important, is that the owner, Martin Meijer, had no idea that there was a hole in this auger. He had no reason to inspect it, because the four he had, which were just like it, had a protective screen. Why would he? There was no facts. And one of the things Judge Lurie honed on is, there was no facts in this case to give rise to a duty on the part of Martin Meijer to do something. Illinois law is replete that really you don't have a duty unless you know the problem. He never knew that there was a problem. Now, we go, Mr. Ratzak started with... I thought that there was a moment that he visited the site and saw the, I assume he saw the operation going and he was there. That is absolutely... He said that he didn't see it. That is absolutely incorrect, Your Honor. Mr. Ratzak, for the first time, brings that up in this brief. It was not an issue in the trial court. Mr. Ratzak, in his brief, does say that Martin Meijer went to the scene. That is not correct. What happened is Martin... I took the deposition of Ray Smith. Ray Smith said, I believe, it was page 125 of his deposition, I believe Martin Meijer is present. I thought Martin Meijer was present. But Ray testified that Jerry Gilbert and Mike Wilbert repaired it. So obviously we take the depositions of each of those gentlemen and they clearly and unequivocally indicated that Martin Meijer was not present. So at the trial court level, knowledge was never an issue and it's only being raised at this level. Does that answer your question, Justice? Yes. I have a question. Go ahead, Justice Smith. My question is based on yours. Maybe you're going to answer the same question. I was going to ask, didn't he have a duty to look at it? He was borrowing it from somebody else. It was used equipment. He was going to be giving it to his employees or putting it in place for his employees to use. Didn't he have some obligation to look at it? The general principle of law in the state of Illinois is you have to provide your employee with a safe place to work. That's a general rule. We agree with that. But there are a number of cases that say that is overcome. And the case that really is what gives rise to the duty to inspect, they've only had it three days. He expects there's a case that is absolutely on point. It's Clark v. Rural Electra. And now it has the same effects. A farmer tells a 17-year-old boy to mow grass. The boy goes out, and since he last mowed the grass, there had been a windstorm, and a wire came down. He was electrocuted. And they said exactly what you said, Justice McDade, that he had a duty to inspect, that it was an unsafe condition. In the court, granting summary judgment said that that period of time was too short to create a duty on the part of the defendant. And what is even better about this case compared to Clark, in Clark there was a precipitating event, a windstorm, which in this case, Ray Smith is a professional grain handler. He has worked as soon as he was healthy and returned. He didn't have a driver's license, so he handled the grain. He set up the situations. He's also Mr. Meyer's main mechanic. So does that answer your question? So, yes, generally, what are the facts that give rise to the duty? And as Clark said, it's too short a time. Okay, but it seems to me that Clark isn't on point at all. I mean, this was a piece of equipment that Mr. Meyer was borrowing from somebody else and was bringing it in for his employees to use. He didn't know anything about it. That, to me, is not the same thing as a wire being blown down in a windstorm. Well, the thing was that the argument there was that he, after the windstorm, didn't go to inspect. And it was a seven-day period. They said that wasn't long enough. The other thing it said about that in Clark is that it's not really a question what, and this goes to the whole, whether he appreciated the risk, but whether the person had noticed it. And you have your best person who has an Excel phone. Would you not expect to not use it? And I guess the converse of that, Justice, is that if Mr. Meyer or Mr. Smith knows that there is a hole, and there's cases that says Webster, and he knows there's a hole. He sees it there. In the argument that they made that you addressed, Justice Litton, about he may be seeing a hole, he said it was so readily apparent that anyone would see it. Well, you're now asking to ignore everything he knew. Now, I'm kind of rambling here, but when I asked Mr. Smith in his deposition, I asked him, when you stepped over the hopper, were you aware that there was a hole in the hopper? Yes. It drew a speaking objection. I asked it again. When you stepped, same question, and he said, I couldn't see the hole because of the beans. Now, the difference is he said he was aware of the hole, but he couldn't see it. But if you know the hole and you're aware of it when you step over it, isn't that the same as knowledge? It's like if you go and you hire your next-door neighbor to plant a plant, and he digs a hole, he puts the dirt all around it, goes home, has lunch, takes a nap, comes back, and because of the dirt, he's surrounded it, he steps and breaks his leg, and he sues you because you provided him with an unsafe work environment. Did you have any duty to inspect? Did he put the dirt too close and obscured his vision? And the other thing... Can I interrupt? Yes. Following up with Justice McDade's question earlier about the multiple augers and everything being moved around, Ray picked up this auger that was borrowed from the Timmons, and he placed it north of the bridge. Is that what you're saying? No. Did it ever move from where he put it? Never moved, no. All my clients' augers were on the other side, south of the river, and they were working on the bridge, so they had trouble coming over. So he just went to his cousin who lived right down the road and borrowed me one facility where Ray Smith had used it. The other thing I think I really have to bring up is... His cousin is Timmons. Rich Timmons, yes, that's his cousin. Who is his cousin? What's that? Meyer's cousin or Ray Smith's cousin? It's Marty Meyer's cousin. All right. Okay. Now... So who directed Ray to go to Meyer's cousin to pick up that? My client instructed him to go there. Now, Mr. Timmons did not tell my client that there was a hole in it. Marco, the co-employee, did not tell Marty Meyer that there was a hole in it, and Ray Smith didn't tell him. Another thing I'd like to address is about the open and obvious condition. As Mr. Ratzig pointed out, you have to appreciate the danger. Mr. Smith said that he knew that jumping over an operating auger was dangerous. He acknowledged that. He said the danger of working around PTOs and augers was so self-evident that he didn't even warn his person. Now, I guess a question, and this is a fact, but why did he do this? He says it's to check the bin. His fellow worker is next to him and says he thought, because we're at the end of the day, that he was going to get his cigarettes or cell phone, which were in the suburban, which was directly across from the auger. That's a question of fact. They disagree. But what are not facts? In order to unload the bins, you have to lift a truck, and it was the last lift of the day. The bins were flowing perfectly. There was no evidence the bin was overflowing, about to overflow. The protocol at Meijer Farms is to check it either before or after, and he had a whole bunch of options. First of all, if he was going to do it, he had to talk with Mr. Wilbur to tell him that I'm going there because of the noise of the diesel truck and the tractor. He can't hear us. He would have to step around the tractor or have hand signals. There was no communication. More importantly, he had two safe alternative routes. A11 is a perfect diagram. It's done by, I believe, our expert. And it shows that going around the tractor, whether you jump over that hopper or go around the tractor, it's the same distance. So he could have walked around the tractor safely. He could have walked around the truck, or he could have had Jerry Garrett, the truck driver, who had made the last lift go check it, or, more importantly, he could have simply shut down the bins. Mr. Bracek said if he did that, it should have been. That would be if there was an emergency. All he would have to do is lower the bed, stop the flow of the bins. Once he stopped the flow of the bins, he can let them run out. And at that point in time, if you don't have any bins there, that hole is ebbing. So I quickly have my address that issue. Then I'm going to move on to the deliberate encounter. And I think by the fact, in this particular case, that they have raised the distraction and deliberate encounter exception, I think they have acknowledged the open and honestness. Keep in mind, as I said, he never said he wasn't aware. And under the premises liability, it's known, readily discoverable, or open and obvious. This poor being didn't know if he could say, well, he knew about it. He was aware of it. But on a deliberate encounter, why that does not apply in his, Your Honor, is that, first of all, the predicate, really in all negligence cases, the factual predicate is knowledge and foreseeability to the defendant. How can Marty Meyer foresee, reasonably foresee, that his employee would break two protocols? We talk about a hopper. As Judge Story pointed out, opening the hopper door is not what occurred here. It's jumping over the auger. It's the appreciation of the defendant. It would not be foreseeable that he would break two protocols and jump over a moving auger and check a bin when it was not. With regard to the deliberate encounter, one, in that case, the owner knew of the defect and knew the person had to encounter it. Here, Mr. Meyer did not know of the defect. He had no reason to foresee that he would encounter this situation when he had multiple options, safe options. There's no economic compulsion because somebody's healthy return to work. And then you also, you know, the fever says it. Is it foreseeable? And that's the same with the distraction. Is it foreseeable for the defendant to expect that he would do this? Zewacki, which is a very similar case here, said the employer doesn't have to take greater protection of the employee and he takes care of himself. What you're asking here is for him to anticipate the negligence of some other individual. Ladies and gentlemen. I have a question. Isn't there a duty to inspect before you direct the employee to bring the equipment on site? I mean, if he was buying the equipment, he would look at it, but he's borrowing it. So why didn't he have a duty to inspect before he ever directed Ray to pick it up? Because, first of all, there's really no facts that give rise to that duty. Would you not expect your most professional, long-time, full-time employee, who's picking it up, what can't you rely on him to tell you that we're at the Timmons Farm and he sees it? They're greasing it for dessert. They're taking a hole and they're actually greasing it. Now, shouldn't he have an obligation to tell Mr. Meyer that so he could do something? Or when he came, who was driving back and he can't drive, so Mark was there to call Mr. Meyer? So he gets there, he uses it, and continues to use it without ever telling Mr. Meyer. He could have. He had options. You've answered my question. But he had options, Your Honor. Thank you. Thank you. Aren't those fact questions? I'm sorry? Aren't those fact questions that should go to the jury? Well, I think the clerk in the line of cases I cited indicate that he didn't have... First of all, there are no facts... There wasn't... Clark is the same issue as I indicated. And they found that seven days wasn't a reasonable enough time to impose that duty. Here we have three days. And the difference there, there was a precipitating event. Here we have no precipitating event. We have a mechanic that could have simply stopped using it, not used it. He didn't have to use it. Or he could have repaired it. Or he could have told Marty. Okay, well, maybe Mr. Smith didn't appreciate the significance of the 8x10 hole in the screen. Well, he appreciated the danger. He said that numerous times. He was aware that jumping over augers was a dangerous activity. And whether hole or no hole. I mean, can you imagine, you got two screws and you got... Why would you hole or no hole and not do it? He appreciated it. I asked him about the parts I know. What do you instruct to your employees about PTOs? He said, everybody knows they're dangerous.  because everybody knows that. That imputes to him, too. He had options to remedy the situation. And consequently, there were no facts to give rise for him to do. What you would expect, I mean, he's encountered danger on his own, without knowledge to Mr. Marty. He's willingly done this, and now he wants to impute it to him. I hope did that answer your question, Justice? Thank you. Thank you. Thank you very much. Mr. Rancic, when you're ready. Thank you. I believe so. Oh, thank you. I will not use it all, I hope. Very, very brief. At page 188 of the record and 125 of the deposition page, Mr. Smith said Mr. Meyer was there when they fixed the auger that day. And if he was there because the hole was obvious, Mr. Meyer would have seen it. That's logical. Mr. Meyer said he wasn't there. That's a question of fact for the jury. That can't be summed or judged. Assuming Mr. Meyer wasn't there, as I think your honors have recognized, and the council agrees, Mr. Meyer had a duty to inspect. And the Barslow case, which we've cited,  says the duty to inspect to make sure the equipment is safe is greatest on the employer, that the employer's duty is greater than the employee. Can he delegate it to the employee that's using the equipment? He cannot. The Stone case says it's a non-delegable duty, which is what distinguishes the farm cases from the property owner's cases where I can delegate my duty as a property owner, but I cannot delegate a duty under these circumstances as an employer. It's not a law you see very often because this is the only situation I'm aware of where you have to sue your employer because your employer opted not to go into workers' compensation. The question is going to be for the jury, is the jury going to believe that Mr. Smith was reasonably distracted? If they do, then we should prevail. If we don't, we will lose. But we do have the right to get to that point. And my final point, unless the court has some questions, is that in all the time council was up here, I saw the same thing happen that happened in the trial court and in his brief on appeal. Council does not mention the tarp. It's not just a bad auger. It's a bad worksite because you put this person there with old defective equipment and then give them a slippery place to stand on and you tell them that's how it has to be. It's a combination of events. If he hadn't had the tarp there, he wouldn't have slipped. If he hadn't slipped, he would have hopped over the auger. But the slippery nature of a tarp when you're moving beans that are slippery themselves, that's open and obvious, with or without rain. It is. Actually, in one of my note cards, I realized that as I was coming down here. I said, well, you can see the tarp. He said it was slippery. Then I run back into the deliberate encounter exception. If the boss tells you to put the tarp there, you're going to have to put it there. So the open and obvious exception is a deliberate encounter. And a deliberate encounter is when the employer knows you're probably going to encounter the danger. And if he doesn't step on the tarp, he could have slipped on that tarp and hit his head. And he'd still have a lawsuit. And they would say, well, as Your Honor just said, he knew it was slippery. And our response would be, we get to go to the jury, argue to the jury that the deliberate encounter exception applies. Just like the gentleman in the Clifford case knew the hole was there. And the gentleman in the Schaefer case knew the hole was in the floor. And they fell down those holes. And the court still said, we're looking at deliberate encounter, we're looking at distraction. Unless, Your Honor? Is reasonable foreseeability a question of fact or a question of law? Foreseeability can be a question of law, I would have to say, depending on the facts. In this situation, you have the sites not agreeing as to what the facts are, as to what people knew and what it looked like. And so I think at that point it should become a question of fact. The jury's going to be told it needs to be foreseeable. But whether under these facts it was foreseeable, unless this court decides that no jury could ever reasonably find that Mr. Meyer could foresee that someone might step into this hole or might slip on the tarp or might forget about the hole. Especially where he doesn't inspect the hole. To argue that Mr. Meyer could not foresee that this would happen because he didn't know the hole was there, that's their argument. If he doesn't know the hole was there because he didn't look at it. And Barstow says, he has a duty to inspect it. That's a long answer to your question, Your Honor, but I was using my time up as best I could. Unless Your Honor has further questions, obviously we ask for them personally. Thank you very much. To both of you who skillfully argued a somewhat complicated case. We appreciate that. We're going to stand in short recess and conference the case.